Edward W. Dindinger (ISB #10144)
Runft Dindinger Kohler, PLLC
1020 W. Main Street, Suite 400
Boise, Idaho 83702
P.O. Box 1406
Boise, Idaho 83701-1406
Phone: (208) 616-5459
Email: service@rdkboise.com

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RYAN JENKS, MARISSA JENKS, and JORDAN JENKS,<br><br>　　　　　　　Plaintiffs,<br><br>vs.<br><br>ELMORE CONTY PROSECUTING ATTORNEY'S OFFICE; DEPUTY ADAM SEARLS, in his official and individual capacities, DEPUTY CPL. GARRET KINNAN, in his official and individual capacities; DEPUTY LT. KYLE MOORE; in his official and individual capacities; PROSECUTING ATTORNEY SHONDI LOTT, in her official capacity; and DEPUTY PROSECUTING ATTORNEY HAYES J. HARTMAN, in his official and individual capacities,<br><br>　　　　　　　Defendants. | Case No. 1:24-cv-348<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

## INTRODUCTION

1. This case arises from the unlawful detentions, arrests, and subsequent prosecutions of three members of the Jenks family (collectively, the "Jenks"), Ryan Jenks ("Ryan"), Marissa Jenks ("Marissa"), and Jordan Jenks ("Jordan") in Elmore County, Idaho.

2. The Jenks bring this action pursuant to 42 U.S.C. § 1983 for violation of the Jenks' First, Fourth, Sixth, and Fourteenth Amendment rights under the United States Constitution.

## JURISDICTION

3. This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth, Sixth, and Fourteenth Amendments of the United States Constitution. This Court has subject matter jurisdiction over the federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

## VENUE

4. On information and belief, all or most of the Defendants reside in Elmore County, Idaho. Additionally, all of the events and/or omissions giving rise to this action occurred in Elmore County, Idaho. Therefore, venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(1)-(2) and (c).

## PARTIES

5. Plaintiffs Ryan and Marissa are the parents of Plaintiff Jordan. They all reside in Elmore County, Idaho.

6. Defendant Elmore County Prosecuting Attorney's Office ("Prosecuting Attorney's Office") is a department of Elmore County, Idaho, responsible for, pertinent to this case, the filing and prosecution of criminal charges, with its address at 520 East 2nd South, Mountain Home, Idaho 83647.

7. Defendant Deputy Adam Searls was, at all times relevant hereto, a law enforcement officer employed by the Elmore County Sheriff's Office.

8. Defendant Deputy Cpl. Garrett Kinnan was, at all times relevant hereto, a law enforcement officer employed by the Elmore County Sheriff's Office.

9. Defendant Deputy Lt. Kyle Moore was, at all times relevant hereto, a law enforcement officer employed by the Elmore County Sheriff's Office.

10. Defendant Prosecuting Attorney Shondi Lott was, at all times relevant hereto, the elected prosecuting attorney of Elmore County, Idaho.

11. Defendant Deputy Prosecuting Attorney Hayes J. Hartman was, at all times relevant hereto, a deputy prosecuting attorney employed by the Prosecuting Attorney's Office.

## FACTUAL ALLEGATIONS

12. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs of this *Complaint and Demand for Jury Trial* as if fully set forth herein.

### The Unlawful Arrests of the Jenks Family

13. On August 3, 2022, Jordan, who was then 18 years of age, was driving near her family's home in rural Elmore County, Idaho. Her then-11-year-old brother, Joseph Jenks ("Joseph") was a passenger in the vehicle.

14. While on a freshly graded dirt road, Jordan's tires were pulled by loose gravel, causing her to lose traction and slide off the road, coming to rest partially through and against a wire fence.

15. Jordan called her parents, Ryan and Marissa, for assistance. Ryan and Marissa quickly arrived in their own vehicles.

16. Ryan and Marissa arranged for a tow truck to come and retrieve Jordan's vehicle. Ryan returned to the Jenks' residence, and Jordan and Joseph waited with Marissa in Marissa's vehicle for the tow truck to arrive.

17. Defendant Elmore County Sheriff's Deputy Adam Searls ("Searls") appeared at the scene in his marked law enforcement vehicle and wearing his uniform.

18. Searls approached Marissa's vehicle and asked her who had been driving the car which had slid off the road.

19. Marissa informed Searls that Jordan had been driving the subject vehicle.

20. Searls requested that Jordan provide him with her driver's license.

21. Jordan asked Searls why he needed her license.

22. Searls replied, "cause I need it."

23. Searls further stated that, "So, in Idaho, anything over $1,500 or more damage is a reportable crash."

24. At this point, Marissa indicated to Searls that she wanted to wait for Ryan to arrive, to which Searls replied, "Okay, that's fine. Okay."

25. Marissa then called Ryan, who is a licensed Idaho attorney, and asked that he come to the scene so he could be present for any further questioning of Jordan by Searls.

26. Searls continued to press Marissa: "However. I'm still requesting her driver's license. All right."

27. Marissa replied that, "She'll give it to [Ryan] when [Ryan] gets here.'

28. Searls insisted, "No, she will give it to me now. Okay. Okay. I am giving a lawful order."

29. Jordan told Searls that her license might still be in her car. Jordan later realized that she had left her license at home.

30. Searls made no further requests for Jordan's identity, such as asking for her name and date of birth.

31. It was clear to both Jordan and Marissa that Jordan was not free to leave until Searls allowed her to leave.

32. Via Marissa's phone, Ryan briefly spoke to Searls regarding Searls' position that an investigation was legally required and told Searls that he was on the way to the scene.

33. This indication that the Jenks desired to assert their legal rights apparently angered Searls, who stated, "Okay, if this is how you want to do…don't worry," as he stormed away from Marissa's vehicle back to his own.

34. After Jordan realized that she had left her driver's license at home, Marissa called Jordan's then-15-year-old sister, Isabel Jenks ("Isabel"), and asked Isabel to bring Jordan's license to the scene.

35. Ryan arrived on-scene shortly thereafter.

36. When Ryan arrived, he approached Searls' vehicle and politely knocked on the closed window, indicating he wished to speak with Searls.

37. Searls indicated to Ryan that he should wait, which Ryan did.

38. Eventually, Searls exited his vehicle and told Ryan that he would not discuss the matter with Ryan.

39. However, Searls did engage in conversation with Ryan.

40. Ryan calmly informed Searls that he was acting as Jordan's attorney.

41. Searls then told Ryan to return to Ryan's vehicle.

42. Ryan protested that he needed to be present during any questioning of Jordan.

43. Searls told Ryan that he would not allow Ryan to be present for Searls' questioning of Jordan.

44. Searls falsely claimed to Ryan that Marissa had refused to identify herself, and displayed his ignorance of Idaho law by stating, "As an attorney, you know that just as well as I do, that there are two times in the state of Idaho that you are required to provide a driver's license, first and foremost when you're under the influence of an alcoholic beverage. And the second one, when you're operating a motor vehicle."

45. In fact, Searls had never asked Marissa to identify herself, as evidenced by Searls' own body-worn camera footage and cell phone footage recorded by the Jenks.

46. Moreover, Marissa had no obligation to identify herself to Searls, as she had committed no traffic violations or other offenses.

47. Ryan corrected Searls, pointing out, "When there is reasonable suspicion on your part that she has committed some sort of violation. So, in my wife's part, there is no reason for suspicion."

48. Searls then backtracked, claiming, "So, however, when I'm dealing with a juvenile, I always get a driver…"

49. Ryan then pointed out that Jordan was not a juvenile.

50. Ryan further clarified that, "So, there was no lawful order to request on my wife's part."

51. Searls admitted, "No. But I did request your daughter's."

52. Searls also falsely claimed to Ryan that Jordan had refused to identify herself.

53. In fact, in response to Searls' inquiry, Jordan had told Searls that she believed her license may have been in her car, and Searls failed to follow up with further questions.

54. Alarmed by Searls' evident agitation, Ryan attempted to deescalate the situation by repeatedly telling Searls that Jordan could and would cooperate in his investigation now that her counsel, Ryan, was present.

55. Searls also expressed doubt that Ryan was an attorney based solely on Ryan's appearance, remarking, "The only thing I know is that you got a man bun and you wear glasses."

56. Ryan asked, "I got a man bun?"

57. Searls went on, "Like, I don't know what office you practice in. I mean, at this point, I'm going to presume private practice maybe."

58. Ryan confirmed, "Yes."

59. Searles continued, "And I don't know how often, how even long you've been doing this."

60. Searls called Defendant Elmore County Sheriff's Deputy Corporal Garrett Kinnan ("Kinnan") to the scene.

61. From the instant of his arrival, Kinnan imitated Searls' aggressive manner.

62. When Ryan politely informed Kinnan that he was Jordan's attorney, Kinnan angrily approached him and said, "It doesn't matter; right now you can step back because you have no business in this right now."

63. Ryan began asking Kinnan, "Are you stating that you are denying Jordan her right to an attorney while being questioned," but, before Ryan could finish his sentence, Kinnan grabbed Ryan's wrists and handcuffed him.

64. Marissa, who had recorded the entire interaction with her cell phone, asked Deputy Searls, "What did we do?"

65. Realizing that Marissa was recording law enforcement officers in the performance of their official duties, as was her clearly established right under the First Amendment, Searls lunged in an attempt to take her phone, but failed to do so.

66. Searls then invaded Marissa's personal space and aggressively told her to, "back off."

67. Searls then took control of Ryan from Kinnan and began walking Ryan to Searls' patrol vehicle.

68. Kinnan then realized that Marissa was still recording law enforcement officers in the performance of their official duties, as was her clearly established right under the First Amendment. Kinnan approached Marissa in an aggressive and threatening manner, snatched her phone from her hand, and handcuffed her.

69. Jordan, on her own phone, was also recording the incident. Kinnan approached Jordan and stated, "You can do this our way or I can do the same thing to these folks with you [sic] and detain you until we are done with our investigation. They are being detained for resist and obstruct, which you're very much likely to happen [sic] if you don't cooperate."

70. Kinnan then immediately handcuffed Jordan while saying, "According to [Searls] no one was cooperating at all."

71. Jordan protested that her family had, in fact, been cooperating.

72. Kinnan replied, "**No, you wanted an attorney**."

73. Isabel arrived at the scene just in time to see Ryan, Marissa, and Jordan in handcuffs.

74. Isabel also saw Joseph, who had witnessed the entire event, traumatized and screaming in Marissa's vehicle.

75. Isabel immediately tried to go help Joseph, but Kinnan aggressively stopped her while holding his hand on his Taser.

76. Kinnan asked if Isabel had Jordan's driver's license; Isabel told Kinnan that she did.

77. Kinnan demanded that Isabel give him Jordan's driver's license.

78. Isabel replied that, because the license did not belong to her, she was unsure if she was allowed to give him the license.

79. Isabel also said she needed to speak to her attorney regarding Kinnan's demand for Jordan's license.

80. Kinnan then threatened to arrest Isabel, invading her personal space and using his size in an attempt to physically intimidate the five-foot-tall teenager.

81. Isabel stepped back from Kinnan and asked him to keep his distance because he was making her uncomfortable.

82. Kinnan again stepped toward Isabel, invading Isabel's personal space, while falsely and absurdly claiming that Isabel was approaching him.

83. Isabel again stepped back, retreating all the way to the berm of the road, and again asked Kinnan to keep his distance.

84. At this point, Defendant Elmore County Sheriff's Deputy Lt. Kyle Moore ("Moore") arrived on-scene.

85. Initially, it appeared that Moore perceived that Searls and Kinnan had acted poorly, and that Moore was attempting to deescalate the situation.

86. Moore spoke with Ryan, and the two of them agreed that Isabel would provide Jordan's driver's license. In return, Isabel would be allowed to depart the scene and return to the family's home with Joseph.

87. Moore also spoke with Searls and Kinnan.

88. Searls and Kinnan falsely told Moore that Ryan, Marissa, and Jordan had refused to identify themselves.

89. Moore attempted to prevail upon Searls and Kinnan to release Ryan, Marissa, and Jordan if they would identify themselves.

90. Searls and Kinnan were initially amenable to Moore's proposal, but decided against it because they wanted to confiscate the Jenks' cell phones, and the footage of the incident contained thereon, so that the Jenks could not "make them look bad."

91. Ryan, Marissa, and Jordan were transported to the Elmore County Detention Center, booked, and charged with resisting and obstructing, a violation of Idaho Code § 18-705.

92. Jordan was not charged with any traffic violations.

93. The reports of Searls and Kinnan allege a property damage (purportedly to the fence upon which Jordan's vehicle came to rest) in the amount of $400.

94. Idaho Code § 49-1305 requires notice to law enforcement of an accident resulting in damage to the property of any one (1) person in excess of one thousand five hundred dollars ($1,500).

95. Searls and Kinnan falsified, fabricated, and omitted material facts in their reports of the incident including, but not limited to, that the Jenks refused to identify themselves and that Ryan refused to "prove" that he is an attorney.

**The Malicious Prosecution of the Jenks Family**

96. On August 4, 2022, Defendant Prosecuting Attorney's Office, relying upon the statements of Defendants Searls, Kinnan, and Moore, and through Defendant Deputy Prosecuting Attorney Hayes J. Hartman ("Hartman"), initiated the prosecutions of Ryan, Marissa, and Jordan (Elmore County Case Nos. CR20-22-02133, CR20-22-02134, and CR20-22-02132, respectively).

97. Despite the fact that there was no probable cause to arrest any of the Jenks, the Prosecuting Attorney's Office has vigorously prosecuted these cases.

98. The Jenks are informed and believe, and therefore allege as fact, that the Defendants' prosecution was motivated by malice.

99. On November 1, 2022, each of the Jenks, through their attorney, filed *Motions to Dismiss* in their respective cases.

100. On December 9, 2022, the Magistrate Court held a hearing on all three *Motions to Dismiss*.

101. On December 13, 2022, the Magistrate Court entered an *Order of Dismissal* as to Jordan's case.

102. On January 4, 2023, the Magistrate Court granted Ryan's and Marissa's *Motions to Dismiss*.

103. On or about January 30, 2023, the Jenks served a *Notice of Tort Claim* upon the Idaho Secretary of State, in compliance with Idaho Code § 6-901, *et seq*.

104. On February 14, 2023, the Prosecuting Attorney's Office filed *Notices of Appeal* in Ryan's and Marissa's cases.

105. On August 21, 2023, the District Court held oral argument on the appeals.

106. On October 2, 2023, the District Court overturned the decision of the Magistrate Court on procedural grounds.

107. On November 9, 2023, Ryan and Marissa filed *Notices of Appeal* of the District Court's decision.

108. As of the date of this *Complaint and Demand for Jury Trial*, Ryan's and Marissa's appeals are pending before the Idaho Court of Appeals.

109. The Jenks are informed and believe, and therefore allege as fact, that the Idaho appellate courts will finally and forever terminate Ryan's and Marrisa's prosecutions in their favor.

110. As a result of their unlawful detentions, arrests, and prosecutions, in violation of their rights under the United States Constitution, at the hands of the Defendants, the Jenks have incurred injuries and damages including, but not limited to: medical bills, chiropractor bills, mental health treatment bills, legal bills, physical injuries, and severe mental and emotional distress.

111. The Jenks demand a trial by jury on all issues so triable.

## CLAIMS FOR RELIEF

### Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)

*Against Searls and Kinnan*

112. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this *Complaint and Demand for Jury Trial* as if fully set out herein.

113. The Jenks had a clearly established right, under to the First and Fourteenth Amendments to the United State Constitution, to freedom of speech and to record matters of public interest, including law enforcement officers in the performance of their official duties.

114. Defendants Searls and Kinnan were angered by the Jenks' verbal resistance to their aggressive behavior and unlawful directives.

115. Defendants Searls and Kinnan were further angered by the Jenks' decision to record their aggressive behavior and unlawful directives.

116. Motivated by the foregoing, Defendants Searls and Kinnan made the decision to detain, arrest, and charge the Jenks under the pretext of resisting and obstructing, thus violating the Jenks' First and Fourteenth Amendment rights.

117. The Defendants' conduct as alleged above was malicious, wanton, oppressive, and/or in reckless disregard of the Jenks' federally protected rights, for which they are entitled to an award of punitive damages under 42 U.S.C. § 1983.

118. As a direct and proximate result of Defendants Searls' and Kinnan's conduct, the Jenks have suffered damages in an amount to be proven at trial.

**Violation of the Fourth and Fourteenth Amendments (42 U.S.C. § 1983)**

*Against Searls, Kinnan, and Moore*

119. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this *Complaint and Demand for Jury Trial* as if fully set forth herein.

120. The Jenks had a clearly established right, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from unlawful and unreasonable searches, seizures, and arrests.

121. Idaho courts have held that speech, passive disobedience, and arguments with law enforcement cannot, alone, be the basis for a violation of Idaho Code § 18-705.

122. Because the Jenks' conduct for which they were arrested amounted, at most, only to speech (including recording), passive disobedience, and arguments, Defendants Searls, Kinnan, and Moore lacked probable cause to arrest any of the Jenks for a violation of Idaho Code § 18-705.

123. By seizing, arresting, and searching the Jenks without probable cause, Defendants Searls, Kinnan, and Moore violated the Jenks' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

124. The Defendants' conduct as alleged above was malicious, wanton, oppressive, and/or in reckless disregard of the Jenks' federally protected rights, for which they are entitled to an award of punitive damages under 42 U.S.C. § 1983.

125. As a direct and proximate result of Defendants Searls', Kinnan's, and Moore's conduct, the Jenks have suffered damages in an amount to be proven at trial.

**Violation of the Fourth and Fourteenth Amendments – Failure to Intervene (42 U.S.C. § 1983)**

*Against Kinnan and Moore*

126. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this *Complaint and Demand for Jury Trial* as if fully set forth herein.

127. The Jenks had a clearly established right, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from unlawful and unreasonable searches, seizures, and arrests.

128. Based upon the aforementioned facts, Defendant Kinnan observed and/or had reason to know that Defendant Searls violated the Jenks' constitutional rights.

129. As Searls' superior, and being present on-scene, Kinnan had a realistic opportunity to intervene and prevent the harm suffered by the Jenks due to Searls' violation of their constitutional rights.

130. As Searls' superior, and being present on scene, Kinnan could have taken reasonable steps to try to prevent the harm inflicted by Searls' violation of the Jenks' constitutional rights.

131. Kinnan failed to attempt to prevent or stop Searls' violation of the Jenks' constitutional rights.

132. Likewise, based upon the aforementioned facts, Defendant Moore observed and/or had reason to know that Defendants Searls and Kinnan violated the Jenks' constitutional rights.

133. As Searls' and Kinnan's superior, and being present on-scene, Moore had a realistic opportunity to intervene and prevent the harm suffered by the Jenks due to Searls' and Kinnan's violation of their constitutional rights.

134. As Searls' and Kinnan's superior, and being present on-scene, Moore could have taken reasonable steps to try to prevent the harm inflicted by Searls' and Kinnan's violation of the Jenks' constitutional rights.

135. Moore failed to attempt to prevent or stop Searls' and Kinnan's violation of the Jenks' constitutional rights.

136. The Defendants' conduct as alleged above was malicious, wanton, oppressive, and/or in reckless disregard of the Jenks' federally protected rights, for which they are entitled to an award of punitive damages under 42 U.S.C. § 1983.

137. As a direct and proximate result of Defendants Searls', Kinnan's, and Moore's conduct, the Jenks have suffered damages in an amount to be proven at trial.

**<u>Violation of the Fourth and Fourteenth Amendments – Malicious Prosecution (42 U.S.C. § 1983)</u>**

*Against Searls, Kinnan, Moore, Prosecuting Attorney's Office, Lott, and Hartman*

138.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this *Complaint and Demand for Jury Trial* as if fully set forth herein.

139.   The Jenks had a clearly established right, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from malicious prosecution.

140.   Despite the clear lack of probable cause to arrest and charge any of the Jenks for a violation of Idaho Code § 18-705, Defendants Searls, Kinnan, Moore, Prosecuting Attorney's Office, Lott, and Hartman initiated and maintained the prosecution of the Jenks.

141.   Plaintiffs are informed and believe, and therefore allege as fact, that the Prosecuting Attorney's Office and Lott approved the decision of Searls, Kinnan, Moore, and Hartman to initiate and maintain the prosecution of the Jenks, and to appeal the decision of the Magistrate Court.

142.   The above-named Defendants prosecuted the Jenks with malice.

143.   The above-named Defendants prosecuted the Jenks for the purpose of denying the Jenks their constitutional rights.

144.   The Magistrate Court terminated the prosecution against Ryan, Marissa, and Jordan in the Jenks' favor.

145.   The Plaintiffs are informed and believe, and therefore allege as fact, that the Idaho appellate courts will finally and forever terminate the prosecutions against Ryan and Marissa in Ryan's and Marissa's favor.

146. The Defendants' conduct as alleged above was malicious, wanton, oppressive, and/or in reckless disregard of the Jenks' federally protected rights, for which they are entitled to an award of punitive damages under 42 U.S.C. § 1983.

147. As a direct and proximate result of Defendants Searls', Kinnan's, Moore's, Prosecuting Attorney's Office's, Lott's, and Hartman's conduct, the Jenks have suffered damages in an amount to be proven at trial.

### **Violation of the Sixth and Fourteenth Amendments – Right to Counsel**

*Against Searls and Kinnan*

148. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs of this *Complaint and Demand for Jury Trial* as if fully set forth herein.

149. Jordan had a clearly established right, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, to have counsel present for any custodial questioning.

150. Jordan was not free to leave at the time Defendant Searls was questioning her.

151. By questioning Jordan, Defendant Searls clearly was trying to establish evidence of the commission of a crime by her.

152. Though no crime was committed, Jordan clearly and unequivocally invoked her right to an attorney prior to questioning.

153. Defendants Searls and Kinnan were obviously infuriated by Jordan's invocation of her constitutional right to counsel.

154. Defendants Searls and Kinnan decided to arrest Jordan for invoking her constitutional right to counsel, and thereby violated the same.

155. The Defendants' conduct as alleged above was malicious, wanton, oppressive, and/or in reckless disregard of the Jenks' federally protected rights, for which they are entitled to an award of punitive damages under 42 U.S.C. § 1983.

156. As a direct and proximate result of Defendants Searls' and Kinnan's conduct, Jordan has suffered damages in an amount to be proven at trial.

## RELIEF REQUESTED

The Jenks respectfully request the following relief:

1. Judgment in favor of the Jenks and against Defendants on all counts;

2. An award of damages in favor of the Jenks and against Defendants, in an amount to be proven at trial;

3. An award of punitive damages in favor of the Jenks and against Defendants, in an amount to be proven at trial;

4. An award of the Jenks' reasonable expenses and attorney fees, pursuant to 42 U.S.C. § 1988 and any other applicable statute or rule; and

5. Such other and further relief as the Court deems just and proper under the circumstances.

DATED this 2nd day of August, 2024.

RUNFT DINDINGER KOHLER, PLLC

/s/ Edward W. Dindinger
Edward William Dindinger
*Attorney for Plaintiffs*

COMPLAINT AND DEMAND FOR JURY TRIAL - 18